772 P.2d 582

**STATE of Arizona, Appellee,**

v.

**John Paul WILHITE, Appellant.**

**No. 1 CA–CR 10582.**

Court of Appeals of Arizona, Division 1, Department B.

Jan. 26, 1989.

Review Denied May 23, 1989.

Robert K. Corbin, Atty. Gen. by William J. Schafer III, Chief Counsel, Criminal Div., and Gerald R. Grant, Asst. Atty. Gen., Susanna C. Pineda, Asst. Atty. Gen., Phoenix, for appellee.

David A. Brown, Apache County Public Defender, St. Johns, for appellant.

## OPINION

FIDEL, Judge.

A jury found the defendant guilty of custodial interference. From that judgment and an aggravated sentence of ten years' imprisonment, he appeals. We address the following claims:

(1) The trial court should have amended the count of custodial interference from a class three to class six felony, because appellant is a "parent" for purposes of the defining statute.

(2) Videotaped testimony of a minor witness was improperly admitted in violation of the defendant's confrontation rights under the state and federal constitutions.

The facts, taken in a light most favorable to sustaining the verdict, are these: Defendant John Paul Wilhite is the biological father of J.E., who was born on March 28, 1973. In 1981 the defendant's parental rights to J.E. were terminated, and the child was adopted by defendant's brother and sister-in-law. Wilhite, who was born on March 30, 1977, is J.E.'s sister.

In 1985 defendant visited his brother's home in Arizona and, without parental permission, drove J.E. and R.D. to a lake on the Zuni Indian Reservation in New Mexico. The three remained at the lake for two nights, sleeping in the car. R.D. claimed that defendant molested her each of those nights. Defendant eventually left the children by the side of the road and told them to hitchhike home. A passing motorist took them to Apache County authorities.

As a result of these events, the state charged the defendant on four counts: interference with the custody of J.E.; kidnapping of R.D. with the intent to inflict physical injury or a sexual offense; and two counts of child molestation for two instances of alleged molestation of R.D. The state later sought sentence enhancement pursuant to A.R.S. § 13–604 by alleging two prior felony convictions.

The trial court dismissed the two counts of child molestation for lack of jurisdiction, finding that none of the elements of those crimes were alleged to have occurred in Arizona. The other counts proceeded to trial before a jury, which found defendant guilty of custodial interference and not guilty of kidnapping.

## I. WAS DEFENDANT A "PARENT"?

■ At the close of the state's evidence, defendant's attorney moved to modify the custodial interference charge from a class 3 felony to a class 6 felony, claiming that the defendant was J.E.'s "parent" within the meaning of A.R.S. § 13–1302(C) and was accordingly subject to conviction only at the lesser felony level. Counsel renewed this motion before sentencing.

A.R.S. § 13–1302 provides:

A. A person commits custodial interference if, knowing or having reason to know that he has no legal right to do so, such person knowingly takes, entices or keeps from lawful custody any child less than eighteen years of age or incompetent, entrusted by authority of law to the custody of another person or institution.

B. If a child is born out of wedlock, the mother is the legal custodian of the child for the purposes of this section until paternity is established and custody is determined by a court.

C. *If committed by a parent* or agent of a parent of the person taken, *custodial interference is a class 6 felony* unless the person taken from lawful custody is returned voluntarily by the defendant without physical injury prior to arrest in

which case it is a class 1 misdemeanor. *If committed by a person other than a parent* or agent of a parent of the person taken, *custodial interference is a class 3 felony.*

(Emphasis added.)

The court denied the defendant's motion and sentenced him as a class 3 felon, accepting the state's position that termination of defendant's parental relationship with J.E. at the time of J.E.'s adoption had foreclosed parental status within the meaning of § 13–1302(C).

A.R.S. § 13–1302 fails to define the term "parent." Where the legislature leaves words undefined, the words are construed according to their common usage unless they have acquired some "peculiar or appropriate meaning in the law." A.R.S. § 1–213. Appellant's proffered definition of parent as "one who begets offspring" has the virtue of common usage. However, adoption is a legal process that terminates previous parental rights and creates a status of "former parent," a term with "peculiar [and] appropriate meaning in the law." *Id.*

Statutory provisions are read and construed in context with related provisions and in light of their place in the statutory scheme. *Grand v. Board of Regents*, 133 Ariz. 527, 529, 652 P.2d 1374, 1376 (1982). We look to related provisions with the goal of achieving consistency among related statutes. *Lombardo v. Pollock*, 21 Ariz. App. 537, 539, 521 P.2d 636, 638 (1974).

Defendant argues that we should look for definitional guidance to A.R.S. § 25–101, the prohibited marriage statute, and § 13–3608, the incest statute. The former voids marriages between parents and children and between other relations of varying degrees of consanguinity. The latter provides:

§ 13–3608: Persons who are fifteen or more years of age and are within the degrees of consanguinity within which marriages are declared by law to be incestuous and void, who knowingly intermarry with each other, or who knowingly commit fornication or adultery with each other, are guilty of a class 4 felony.

Defendant submits that a termination of parental rights would not end one's parental status for the purpose of §§ 25–101 and 13–3608 and likewise should not end parental status for the purpose of § 13–1302(C).

We find no parallel context in these statutes for the meaning of "parent" in § 13–1302(C). An essential concern in both the prohibited marriage statute and the incest statute is consanguinity, a concern that does not end with adoption and the termination of parental rights. Given that concern, the defendant argues reasonably that a biological parent remains subject to those statutes despite the parental transference accomplished by adoption. The essential concern of § 13–1302, by contrast, has nothing to do with consanguinity. It is rather to discourage interference with custodial arrangements established by law.

In § 13–1302, the legislature defined custodial interference by a parent as an offense of lesser criminal status than such interference by another. In so doing, we believe that it designed the lesser category of interference for those with *assertable custodial and visitation interests as parents* pursuant to the child custody statute, A.R.S. § 25–331 *et. seq.* While the legislature intended to employ criminal penalties in order to discourage such persons from taking the law into their own hands, it apparently concluded that a class 6 open-ended penalty would suffice to achieve that purpose.

This case requires us to consider the impact of adoption upon the custodial interests of biological parents. To do so, we turn from the child custody statute in Title 25 to Title 8 (Children), where § 8–117 expressly describes the transformation of relationships that occurs upon the entry of a decree of adoption:

§ 8–117:

A. Upon entry of the decree of adoption, the relationship of parent and child and all the legal rights, privileges, duties, obligations and other legal consequences of the natural relationship of child and parent shall thereafter exist between the adopted person and the adoptive petitioner the same as though the child were

born to the adoptive petitioner in lawful wedlock....

B. Upon entry of the decree of adoption, the relationship of parent and child between the adopted person *and the persons who were his parents* just prior to the decree of adoption shall be completely severed and all the legal rights, privileges, duties, obligations and other legal consequences of the relationship shall cease to exist....

(Emphasis added.)

Under § 8–117, we believe it clear that defendant was transformed in the eyes of the law from the status of parent of J.E. to the status of former parent—a *person who was his parent.* All of the defendant's former rights as parent were severed, including the right to seek J.E.'s custody under Title 25, art. 3. In § 8–117 we find appropriate definitional context—the context of custodial interest—for the use of the term "parent" in § 13–1302. Defendant had no parental custodial interest assertable in court and thus no claim to the reduced criminal status available to parents under § 13–1302. We conclude that the defendant, as a former parent, was not a parent within the meaning of § 13–1302 and that the trial court correctly denied his motion to alter the classification of his conviction from class 3 to class 6 status.

## II. VIOLATION OF DEFENDANT'S CONSTITUTIONAL CONFRONTATION RIGHTS

### A. *Procedural History*

■ J.E. and R.D. did not appear at trial to testify against defendant. Instead, upon motion by the state, their testimony was videotaped and presented to the jury pursuant to A.R.S. § 13–4253. That statute provides in pertinent part:

B. The court, on motion of the prosecution, may order that the testimony of the minor be taken outside the courtroom and be recorded for showing in the courtroom before the court and the finder of fact in the proceeding. Only those persons permitted to be present at the taking of testimony under subsection A may be present during the taking of the minor's testimony, [the attorneys for the defendant and for the state, persons necessary to operate the equipment and any person whose presence would contribute to the welfare and well-being of the minor] and the persons operating the equipment shall be confined from the minor's sight and hearing as provided by subsection A. The court shall permit the defendant to observe and hear the testimony of the minor in person but shall ensure that the minor cannot hear or see the defendant. The court shall also ensure that:

1. The recording is both visual and aural and is recorded on film or videotape or by other electronic means.

2. The recording equipment was capable of making an accurate recording, the operator was competent and the recording is accurate and is not altered.

3. Each voice on the recording is identified.

4. Each party is afforded an opportunity to view the recording before it is shown in the courtroom.

C. If the court orders the testimony of a minor to be taken pursuant to this section, the minor shall not be required to testify in court at the proceeding for which the testimony was taken.

The state filed a written motion that the testimony of R.D. be taken by videotape, but filed no corresponding motion as to J.E. The state avowed that "[R.D.] ... had recently developed a fear of testifying in front of a jury" and "is extremely hesitant and emotionally distraught...." The motion did not disclose the source of the information. No affidavits were attached.

The court granted the motion upon oral argument without evidence. The state then asked to amend to include J.E.:

THE PROSECUTOR: Can we amend that to both minors, your Honor?

THE COURT: Well, you didn't put in both minors. But, you want to put in both minors? Do you have any objection

to that, to the amending of the motion as to including the boy as well as the girl? DEFENSE COUNSEL: No, I believe that's the court's ruling.

Though the state neither argued nor offered evidence that J.E. was unable to testify in the presence of his father, the trial court granted the amended motion.

The record does not show whether the taping was done in the manner required by § 13–4253. However, defendant's counsel made no objection on statutory procedural grounds when the tapes were introduced at trial. He objected only on constitutional grounds as follows:

DEFENSE COUNSEL: Your Honor, I'd like to make a record concerning the constitutionality of the videotape testimony statute, just as a matter for preservation of the issue on appeal. I believe that that statute is possibly unconstitutional, and I want that noted in the record.

TRIAL JUDGE: Yeah. I think the record should reflect that he's making an objection on the grounds that 13–4253 is unconstitutional and violates the Sixth Amendment of the defendant as well as the Fourteenth Amendment. And, I had already indicated to counsel, I don't know whether you were in here or not, but in any event, I'm not going to deal with the constitutionality. But, it ought to be preserved in the event the court of appeals thinks otherwise. I think it's probably constitutional, but so be it.

Now on appeal defendant argues as to the tape of *J.E.* that the trial court erred in permitting the taping upon oral rather than written motion, that the taping procedure failed compliance with express statutory requirements,[1] and that the tape was unconstitutionally substituted for live testimony in violation of his constitu-tional confrontation rights. *Defendant makes no such arguments concerning the tape of R.D.*, conceding for purposes of appeal that her testimony was appropriately introduced by videotape. In light of this concession, we limit our discussion to the taking of J.E.'s testimony by videotape.

We find preliminarily that the defendant waived each of his objections to the videotaped testimony of J.E. except his objection as to constitutionality, as that is the sole objection that he raised at trial. Rule 103(a)(1), 17A A.R.S. Arizona Rules of Evidence. ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and (1) ... In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context....")

### B. *Absence of Individualized Findings*

Our review of the constitutional issue is foreshortened by decisions issued by the United States Supreme Court and the Arizona Supreme Court during the pendency of this appeal. In *Coy v. Iowa,* —— U.S. ——, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988), the United States Supreme Court considered the validity of an Iowa statutory substitute for *face-to-face* confrontational testimony by child witnesses. Pursuant to Iowa's statute, two teenaged victims of a sexual assault were permitted to testify at trial behind a screen. Special lighting permitted the defendant to dimly view the witnesses, but prevented the witnesses from seeing him. The Court found this an "obvious [and] damaging violation of the defendant's rights to a face-to-face encounter." —— U.S. at ——, 108 S.Ct. at 2802, 101 L.Ed.2d at 866.

---

1. Defendant argues that the videotaping equipment and its operators were not "confined from the minor's sight and hearing," as the statute requires. Additionally he argues that the trial court failed to provide him with the opportunity to observe and hear J.E.'s testimony, albeit shielded from J.E.'s view. No record exists from which we can determine the accuracy of the defendant's complaints, which, in any event, were not raised before the trial court. Defendant now argues, additionally, that the trial court erroneously permitted J.E.'s videotaping upon oral, rather than written motion. This objection was expressly waived before the trial court, as indicated in the exchange quoted above.

The Court rejected the state's argument that the "confrontation interest at stake ... was outweighed by the necessity of protecting victims of sexual abuse" and that the statute at issue had created a "legislatively imposed presumption of trauma" for child abuse victims. *Id.* at ——, 108 S.Ct. at 2802–03, 101 L.Ed.2d at 866–67. Reversing the conviction, the court held that, because there were "no *individualized findings that these particular witnesses needed special protection,* the judgment ... could not be sustained by any conceivable exception." —— U.S. at ——, 108 S.Ct. at 2803, 101 L.Ed.2d at 867 (emphasis added).

In *State v. Vincent,* 159 Ariz. 418, 768 P.2d 150, (1989), the Arizona Supreme Court examined the witness-shielding procedures of A.R.S. § 13–4253 in light of *Coy.* Although the court concluded that the statute is capable of constitutional application, it also concluded that the statute was unconstitutionally applied in the absence of an individualized showing of necessity. *See also State v. Vess,* 157 Ariz. 236, 756 P.2d 333 (App.1988).

In the present case the state not only failed to show the J.E. needed special protection from a face-to-face courtroom encounter with defendant; it did not even *allege* such a need. As in *Coy, Vincent,* and *Vess,* it supplied the trial court with no constitutional basis for the abridgement of defendant's confrontation rights. Defendant's constitutional objection should have been sustained under both the Sixth Amendment to the U.S. Constitution and article 2, § 24 of the Constitution of Arizona.

### C. *Harmless Error*

■ We next consider whether the trial court's error in permitting J.E.'s testimony by videotape was prejudicial or harmless. The U.S. Supreme Court has "repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." *Rose v. Clark,* 478 U.S. 570, 576, 106 S.Ct. 3101, 3105, 92 L.Ed. 2d 460, 469 (1986) (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674, 684 (1986). Harmless error analysis applies to confrontation clause violations as well as other forms of constitutional error. *See Schneble v. Florida,* 405 U.S. 427, 432, 92 S.Ct. 1056, 1059–60, 31 L.Ed.2d 340, 345 (1972).

The test for prejudicial error is stated in *State v. McVay,* 127 Ariz. 450, 453, 622 P.2d 9, 12 (1980):

> The question is not whether, absent the error, there were sufficient facts from which the jury could find the defendant guilty, the question is whether, without this evidence, the appellate court can say, beyond a reasonable doubt, that the jury would have found the defendant guilty.

The trial primarily concerned the state's effort to prove that the defendant had kidnapped R.D. with the intent to sexually molest her. There was comparatively little focus at trial on the charge relating to J.E.— the charge of custodial interference. Because the jury acquitted the defendant of the first charge, we concentrate our harmless error analysis on the second.

J.E. gave the following testimony pertinent to the charge of custodial interference:

(1) He and R.D. were driven by defendant to a lake in New Mexico and stayed there with the defendant for two nights.

(2) The night before they left, the defendant asked J.E. to accompany him on a trip and to encourage R.D. to go as well.

(3) Neither he nor Rachel asked permission from their parents.

(4) Shortly after they left their parental home, the defendant stopped at a grocery store in Concho and asked J.E. and R.D. to duck down in the seat so that they would not be seen as the defendant ran in for beer and cigarettes.

(5) After two nights of camping, the defendant took J.E. and R.D. to the side of a

road, told them to hitchhike home, and watched from a bush as they sought a ride.

(6) The defendant suggested some lies for J.E. and R.D. to tell about where they had been during their two nights away from home.

All of this evidence, no doubt, supported the jury's conclusion that the defendant had committed the crime of custodial interference. Yet we are satisfied beyond a reasonable doubt that, if the jury had ignored J.E.'s testimony entirely, it would have reached the same conclusion on the basis of the remaining evidence.

To establish the crime of custodial interference the state needed to prove (1) that J.E. was less than eighteen years of age, (2) that he was entrusted by authority of law to persons other than defendant, (3) that the defendant took, enticed, or kept him from his lawful custodians, and (4) that the defendant knew or had reason to know that he had no legal right to do so.

We note preliminarily that J.E.'s testimony on the points outlined above was essentially duplicated by the testimony of R.D. As we have indicated, the defendant does not maintain upon appeal that her testimony was improperly introduced by videotape or improperly considered by the jury.

Second, the defendant chose from the outset of the trial not to contest that he had taken the children from their home. Defense counsel conceded the taking in opening statement. He later withheld objection when the prosecutor asked the children's father, "And how long was [the defendant] gone with your children?" He again withheld objection when the prosecutor asked an investigating officer whether the children had "describe[d] to you the events that occurred during the time that they were with the defendant," a question the officer answered affirmatively. From opening statement on, it appears that counsel's strategy was to acknowledge that the children accompanied the defendant, but to stress that they did so voluntarily and to attack the allegation that a molestation had occurred. He stated in opening statement:

The children had no fear of Johnny [the defendant]. The children voluntarily went with Johnny where he went. The evidence will show that the only person who was in that car other than R.D. and Johnny was [J.E.], her older brother, and he was right in the car. And, he'll testify, you'll hear him testify; he slept both nights and he heard nothing that would indicate that there was any kind of sexual abuse going on in the back seat. . . .

Just as the taking was undisputed, so were the minority of J.E., the custodial status of his adoptive parents, and the absence of parental permission. J.E.'s minority was proven by birth certificate. The rights of his parents were proven by certificate of adoption. Both parents testified that they had not Both parents testified that they had not given permission for the trip to either the children or to the defendant. Moreover, the children's father established a knowing interference when he testified that he had refused permission moments before the defendant's departure, when the defendant had asked if he could take the children to the store. The defendant did not take the stand, and no other witnesses contradicted the testimony of the parents.

In sum, excluding consideration of J.E.'s testimony, we find that the remaining evidence overwhelmingly supports the conclusion that the defendant was guilty of the crime of custodial interference. For this reason, we find that the admission of the testimony of J.E. by videotape was harmless error.

The judgment and sentence of the trial court are affirmed.

CONTRERAS, P.J., and GREER, J., concur.